## EL DIA INS. CO. v. SINCLAIR.

(Circuit Court of Appeals, Second Circuit. December 14, 1915.)

No. 36.

1. INSURANCE ⬤➔136—DELIVERY OF POLICY—NECESSITY OF DELIVERY.

If there is a binding contract of insurance, the fact that the policy is not delivered until after a loss occurred does not defeat insured's right to recover under the contract.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 219–230; Dec. Dig. ⬤➔136.]

2. EVIDENCE ⬤➔441—PAROL EVIDENCE TO VARY WRITING.

A policy of insurance, issued by the insurance company and accepted by insured, is in law the final contract between the parties, and supersedes all preliminary agreements in respect to the insurance, in the absence of fraud or mistake.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1719, 1723–1763, 1765–1845, 2030–2047; Dec. Dig. ⬤➔441.]

3. EVIDENCE ⬤➔434—PAROL EVIDENCE—EVIDENCE OF FRAUD.

Extrinsic evidence is always admissible to show, for the purpose of invalidating a written instrument, that its existence was procured by fraud, or that by reason of fraud it does not express the true intention of the parties.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2005–2020; Dec. Dig. ⬤➔434.]

4. EVIDENCE ⬤➔433—PAROL EVIDENCE—EVIDENCE OF MISTAKE.

Extrinsic evidence may be received for the purpose of showing that by reason of a mistake a written instrument does not truly express the intention of the parties.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1990–2004; Dec. Dig. ⬤➔433.]

5. INSURANCE ⬤➔262—VALIDITY OF POLICY—FRAUD—FAILURE TO DISCLOSE LOSS.

Pursuant to negotiations between brokers representing the D. Co. and the agent of an insurance company, the agent on April 28th wired the broker "binding $15,000" and asking the brokers to send forms. The D. Co.'s general manager was informed of this telegram. On April 29th the brokers wrote the agent, inclosing forms, but on April 30th wired the agent not to use such forms, and sent new forms. On April 29th a fire took place. The brokers did not know of this fire, and the company's general manager did not know of the substitution of the forms. Held, that the failure of the D. Co. and the brokers to give the insurance company notice of the loss before the subsequent issuance of the policy did not amount to fraud affecting the policy, as insured, knowing that the risk had attached and not knowing of the substitution of forms, was not called upon to say anything, while no fraud could be attributed to the broker because of his failure to give notice of that of which he had no knowledge.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 557; Dec. Dig. ⬤➔262.]

6. INSURANCE ⬤➔127—EXISTENCE OF SUBJECT-MATTER—ANTEDATING POLICY.

The rule that, if parties contract regarding a thing which, unknown to them, does not exist at the time, there is no contract, because of the lack of a subject-matter, did not apply where an insurance policy was antedated, and the property insured was in existence at the date as of which the policy was issued, but had been destroyed by fire prior to its issuance; and the fact that the property was not in existence did not inval-

⬤➔For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

228 F.—53

idate the policy, as, by antedating the policy, the insurer assumed the restrospective risk for which it provided, in the same manner as if it had been issued on the day it bore date.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 186, 187; Dec. Dig. ☞127.]

7. INSURANCE ☞132—REQUISITES OF CONTRACT—BINDING SLIPS.
A contract of insurance is ordinarily complete and closed when a binder is signed and delivered.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 210; Dec. Dig. ☞132.]

8. INSURANCE ☞646—ACTIONS ON POLICIES—PRESUMPTIONS AND BURDEN OF PROOF.
In an action on a fire insurance policy, the burden was on defendant to prove by a fair preponderance of the evidence that fraud was practiced on it or its adjuster in misrepresenting the value of the property destroyed.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1555, 1645–1668; Dec. Dig. ☞646.]

9. APPEAL AND ERROR ☞1003—REVIEW—QUESTIONS OF FACT.
The verdict of a jury on a question of fact fairly presented to them is not to be disturbed, unless clearly against the weight of the evidence.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3938–3943; Dec. Dig. ☞1003.]

10. APPEAL AND ERROR ☞959—REVIEW—DISCRETIONARY MATTERS—AMENDMENTS.
In an action on a fire insurance policy, defendant pleaded that the contract of insurance in force at the time of the loss contained terms and conditions different from those alleged in the complaint, and that insured misrepresented to its adjuster the amount and value of the property, with intent to deceive and defraud it and create a liability on its part greater than was warranted by the facts. *Held*, that a motion to amend the answer, so as to plead fraud in the execution of the policy, was addressed to the discretion of the trial judge, and its denial presented no question which could be reviewed.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3825–3831; Dec. Dig. ☞959.]

Lacombe, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Southern District of New York.

The plaintiff below is a citizen of the state of New York, and brings this action as assignee of the Duluth Log Company, a corporation organized and existing under the laws of the state of Minnesota. The El Dia Insurance Company is a corporation organized and existing under the laws of the kingdom of Spain, having its principal office in the city of Madrid. It has no branch office in the United States, but transacted its business in this country through John L. Dudley, Jr., a New York corporation residing in New York City. The facts of the case are stated in the opinion.

Van Iderstine, Duncan & Barker, of New York City (Wendell P. Barker, of New York City, of counsel), for plaintiff in error.

William Otis Badger, Jr., of New York City (Louis J. Wolff, of Brooklyn, N. Y., of counsel), for defendant in error.

Before LACOMBE, COXE, and ROGERS, Circuit Judges.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ROGERS, Circuit Judge. This action is brought to recover under a contract or policy of insurance. The complaint alleges that the Duluth Log Company, hereinafter referred to as the insured, applied to the El Dia Insurance Company, hereinafter referred to as defendant, for insurance against loss or damage by fire upon certain of its property consisting of lumber and timber products located in the state of Minnesota; that on April 28, 1913, the defendant insured the said property for the term of one year from said April 28, 1913, at noon to April 28, 1914, at noon, in the sum of $15,000; that pursuant to this agreement the defendant issued its policy on May 10, 1913; that on April 29, 1913, a fire occurred which damaged the insured's property to the extent of $33,183.04; that thereafter the defendant, through its adjuster, adjusted the loss and fixed the amount at $33,183.04; that the proportionate share of the loss chargeable to the defendants under the policy was $11,483.33.

The answer admits that a contract of insurance was entered into on April 28, 1913, and that defendant agreed to issue a policy expressing the terms and conditions agreed upon in the contract of April 28th. It admits that it issued its policy on May 10, 1913. It admits that it insured the property to an amount not exceeding $15,000, and that it designated and appointed an adjuster for the purpose of adjusting the loss. That the fire occurred is not denied. It alleges that the insured misrepresented to its adjuster the amount and value of the property with the intent to deceive and defraud it and create a liability on the part of the defendant greater than was warranted by the facts. It also alleges that its contract of insurance of April 28th was made upon the following terms and conditions: (1) That the maximum liability of the defendant during the term of the contract of insurance should not exceed $15,000. (2) That the defendant's liability for loss resulting from any one fire should not exceed 30 per cent. of such maximum liability. (3) That the said insurance should be subject in case of loss to what is commonly known as the 80 per cent. coinsurance clause. The policy as issued does not contain any coinsurance clause. It provides insurance to an amount not exceeding $15,000. It does not contain any clause limiting the defendant's liability for loss so that it should not exceed 30 per cent. of the maximum liability, thus increasing the defendant's apparent maximum liability by reason of one fire from $4,500 to $15,000. The answer also avers that by reason of fraud and deceit practiced upon defendant the contract of insurance entered into on April 28, 1913, has become and is void.

At the trial the counsel for defendant undertook to show that the policy as issued on May 10th did not conform to the contract of insurance as agreed upon on April 28th. This the trial judge refused to allow, and his refusal is assigned as error; and this alleged error we shall first consider.

The historical sequence of events is this:

On April 21, 1913, the Duluth brokers, acting for the insured, telegraphed the agent of the defendant in New York and asked the latter to place $50,000 insurance (a floater policy) on behalf of the Duluth Log Company and the Bradley Timber & Railway Supply Company on their

timber products in Northern Minnesota; rate "not to exceed two fifty net." To this came by telegraph the reply on April 22d:

"Message twenty-first received forward immediately copy of forms to be used showing limit by reason any one fire also coinsurance conditions."

The same day the broker at New York addressed a letter to the Minnesota brokers which reads as follows:

"Replying to your message of April 21st, and confirming our reply of even date, would state that it is impossible for us to advise definitely whether we can handle this proposition or not until we have before us a copy of the form. The company will require a coinsurance clause equal to at least 90 per cent. They will also require a limit by reason of any one fire. As soon as we have full information before us, we will promptly advise you."

On the same day the brokers for the insured telegraphed a night letter to the defendant's agent in New York which reads:

"Limit any one fire thirty per cent. of face of policy will use eighty per cent. clause as soon as the assured are able to check up value of their property sending forms by mail to-day."

On April 23d, the insured's brokers wrote and mailed a long letter to the defendant's agent in which the telegram of April 21st was confirmed. It said:

"We hope you may be able to cover this order or a part of it at the rate indicated, gross rate of 3 per cent., and as soon as the owners are able to arrive at the exact value of their property they will use the 80 per cent. coinsurance clause."

On April 28th the defendant's agent telegraphed:

"Binding fifteen thousand each lumber Bradley, Duluth Log. Send forms."

On April 29th the fire took place at about 4 p. m. and the president of the Duluth Log Company was informed of the fact by telegraph about 9:30 p. m. of the same day. Prior to the fire he had been informed of the telegram of April 28th. He did not inform his brokers of the fact of the fire. On April 29th the insured's brokers wrote the defendant's agent a letter as follows:

"Following your telegram of the 28th instant in which you state you have bound $15,000 under each schedule, the Duluth Log Company and the Bradley Timber & Railway Company, at a rate of 3 per cent., we are inclosing you herewith forms, and trust you will let policies come forward as soon as possible. If you succeed in placing any additional, kindly wire us."

The letter was written without knowledge of the fire, and perhaps before the fire had occurred, as the fire broke out late in the afternoon of the same day. It is certain the letter did not reach the defendant's broker until after the loss had been incurred. The record does not disclose what the "forms" were which were forwarded. They were not so far as the record discloses put in evidence.

The next day, April 30th, the agent of the insured telegraphed the agent of the defendant: "Do not use forms sent you yesterday new forms sent you to-day." At that time the insured's broker was still without knowledge of the fire. We do not find these "new forms" in the record. But on May 1st the insured's agent wrote the defendant's agent saying the "amended forms were sent yesterday," adding:

"The forms should have stated the gross amount liable in any one fire, instead of the percentage. That is the only change."

The reason the broker gave at the trial for this change of "forms" was as follows:

"Because in my conversation with Mr. Bradley (the officer of the Duluth Log Company who applied for the insurance) there was nothing said about percentages. In going over the placing of the order with me, the question arose as to what the liability should be under the insurance, taking into account that he was getting $50,000, the amount that might be sustained by the various companies, on their knowing one location. He fixed the amount at $15,000. There was nothing said about percentages. That was not the conversation. So that how I discovered this I cannot tell you; but, when I did discover it, I meant to fill out the contract as entered into between Mr. Bradley and myself."

On May 10th the policy was issued. On May 26th the agent of the insured wrote and mailed a letter to defendant's agent, informing the latter of the fire and asking to have an adjuster sent out to spur No. 318 on the Soo Line, where the fire occurred, and adjust the loss. The letter also stated:

"The Duluth Log Company were unable to report the loss any sooner because of the fact that their woodsman was away and the loss was reported as soon as they were able to ascertain the facts."

At the trial the agent of the insured testified that the first he heard of the fire was a few days prior to the time when the Duluth Log Company notified him; and the testimony was that that notification was given about May 20th.

The policy issued was accepted and retained by the insured as conforming to the contract. On July 7, 1913, long after defendant had notice of the loss, it accepted and retained the premium, amounting to $405. The testimony shows that, if there had been a coinsurance clause in the policy, the premium would have been less. For weeks after the defendant received information of the loss no objection was raised by it that the policy in any way failed to express the contract between the parties. On August 23, 1913, the representative of the company in the United States, with whom all the negotiations leading up to the issuance of the policy were had, wrote the agent of the insured as follows:

"The form under which the insurance was written was drafted with the intention of carrying $50,000 insurance and an order was placed for $50,000. The $50,000 insurance was not secured before the loss occurred, and it then developed that only $15,000 insurance had been secured and all in one company. While we are frank to admit that under a strict application of the conditions of the policy which the assured holds, in my opinion, the company would have little or no grounds on which to contest (and we do not think it is their intention to contest), at the same time the company never anticipated, when writing the policy, to be called upon to contribute the whole amount on a partial loss under such circumstances, and the company do feel that there are reasonable grounds for asking or expecting some compromise."

And on September 20, 1913, in answer to a letter complaining of the delay in paying the loss, the defendant's representative wrote:

"The claim up to date, we think you will agree with us, is not an old one, and in accordance with the usual understanding of the policy form the com-

pany has 60 days from the date of the filing of the proof in which to make settlement. According to the records in our office, the 60 days have not as yet elapsed, and we assure you that there is no reason, so far as we know, for the assured and yourselves to be apprehensive. We anticipate the policy obligation in this instance will be discharged with the same courtesy and promptness that the company adopted during the early part of its existence, which custom has been continued."

At the trial, however, the claim was advanced that the policy did not conform to the contract as it existed when the loss occurred, and that defendant proposed to show that this was so by introducing in evidence the letters and telegrams written prior to the loss. The plaintiff's counsel objected on the ground that, where there is a written formal contract of insurance in evidence, parol evidence cannot be received to vary its terms. The trial judge agreed with this view of the matter, and struck out the telegrams and letters by which it was sought to contradict the policy, and instructed the jury that the contract was to be found only in the policy. It is conceded that this rule would have applied if the fire had not occurred prior to the issuance of the policy, or prior to the changes, if any, which were made after the telegram of April 28th:

"Binding fifteen thousand each lumber Bradley, Duluth Log.   Send forms."

But it is claimed the rule is inapplicable, because the policy actually differs in certain particulars from the contract as it existed when the loss occurred.

[1] The policy, as before stated, is dated May 10, 1913, but is antedated, and insures the Duluth Log Company for the term of one year from the 28th day of April, 1913, at noon, to the 28th day of April, 1914, at noon. It was signed in Madrid, Spain, and it provided that it was not to be valid unless countersigned by John L. Dudley Company, New York, the representative of the company in the United States. It does not appear when it was countersigned, or when it was delivered to the insured; but it is not questioned that it was countersigned and was delivered. If there is a binding contract of insurance, the fact that the policy is not delivered until after the loss has occurred does not defeat the insured's right to a recovery under it. Michigan Pipe Co. v. Michigan F. & M. Ins. Co., 92 Mich. 482, 52 N. W. 1070, 20 L. R. A. 277; Commercial Ins. Co. v. Hallock, 27 N. J. Law, 645, 72 Am. Dec. 379. Indeed, the courts have held that a policy drawn up and signed by the proper officers wants no further delivery. It is a valid policy as soon as signed, and becomes then the property of the insured, and is held by the insurer for his use.

[2] The policy of insurance which the company issued and the insured accepted is in law the final contract between the parties, and supersedes all preliminary agreements in respect to the insurance. Whatever may have been said previously, whatever negotiations may have taken place, all are presumed to have been merged in the written contract. In Merchants' Mutual Ins. Co. v. Lyman, 15 Wall. 664, 21 L. Ed. 246, the law is declared to be that after a policy has been issued and accepted the prior agreement becomes merged in it. In Insurance

Company v. Mowry, 96 U. S. 544, 547, 24 L. Ed. 674, the Supreme Court, speaking of a policy, declared that:

"The entire engagement of the parties, with all the conditions upon which its fulfillment could be claimed, must be conclusively presumed to be there stated. If, by inadvertence or mistake, provisions other than those intended were inserted, or stipulated provisions were omitted, the parties could have had recourse for a correction of the agreement to a court of equity, which is competent to give all needful relief in such cases. But until thus corrected the policy must be taken as expressing the final understanding of the assured and of the insurance company."

So the Supreme Court in a more recent case (Hartford Fire Ins. Co. v. Wilson, 187 U. S. 467, 478, 23 Sup. Ct. 189, 47 L. Ed. 261) quotes approvingly a statement from Harnickell v. New York Life Ins. Co., 111 N. Y. 390, 18 N. E. 632, 2 L. R. A. 150, to the effect that all negotiations and agreements had prior to the issuance of the policy are to be deemed merged in the policy. The Court of Appeals of New York in Walton v. Agricultural Ins. Co., 116 N. Y. 317, 322, 22 N. E. 443, 5 L. R. A. 677, declared that "a policy of insurance is presumed to embrace the entire agreement of the parties." In 16 Am. & Eng. Encyc. L. (2d Ed.) p. 856, the rule is stated as follows:

"The policy of insurance is the final contract between the parties, and the effect of its acceptance is to supersede all preliminary agreements in respect to insurance."

[3] The rule that the written contract, in this case the policy, cannot be contradicted by extrinsic evidence, is subject to certain exceptions as well recognized as the rule itself. As fraud vitiates whatever it touches, extrinsic evidence is, of course, always admissible to show, for the purpose of invalidating a written instrument, that its existence was procured by fraud, or that by reason of fraud it does not express the true intention of the parties.

[4] Extrinsic evidence may be also received for the purpose of showing that by reason of a mistake a written instrument does not truly express the intention of the parties. Many authorities declare that evidence of mistake is admissible only in equity, and not at law, while many others assert that no such distinction exists. See 17 Cyc. 703. But the circumstances of this case do not make it important to determine whether such a distinction exists or does not exist. In Richards on Insurance (3d Ed.) p. 105 (1910), the rule is stated as follows:

"In absence of fraud or mutual mistake the written contract, if there be one, is the best and only admissible evidence of what the contract is as to all matters which it purports to cover."

[5] The policy in the case at bar is not shown to be in any way affected by fraud. Neither the insured nor the insurer's brokers have practiced any fraud whatever upon the insurer or its agents. It is true that after the fire occurred and prior to the issuance of the policy the insured gave no notice of the loss. But the failure to do so is explained. The general manager of the insured said that prior to the fire he had been informed by his brokers that the insurance had been secured, and that he was waiting to get the policy, which had not been

issued. Surely, under the circumstances, he was not called upon to say anything. In Joyce on Insurance, vol. 1, § 108 (1897), it is said that:

> "There is no legal nor moral obligation resting on the assured to voluntarily notify the company of a loss occurring after the risk has attached, although the policy has not been delivered nor the premium paid."

The author cites Keim v. Home Mutual Fire Ins. Co., 42 Mo. 38, 97 Am. Dec. 291; American Home Ins. Co. v. Patterson, 28 Ind. 17. The insured knew the risk had attached, and he knew nothing of the communication relating to the substitution of one set of forms for another; and the broker who forwarded that communication had at the time no knowledge of the loss. No fraud can be attributed to him, because he failed to give notice of what he had no knowledge of until many days afterward. The insured at no time made any misrepresentations, and at no time withheld any facts which it was under either a legal or a moral obligation to make known.

[6] It is equally true that there was no mistake made which in any way affected the policy. In Pollock on Contracts, 383, it is said that mistake does not of itself affect the validity of contracts at all. And Anson in his Law of Contracts (Huffcut's Ed. 1906) § 178, declares that:

> "The cases in which mistake affects contract are the rare exceptions to an almost universal rule that a man is bound by an agreement to which he has expressed a clear assent, uninfluenced by falsehood, violence, or oppression."

Nevertheless mistake may be such as to prevent any real agreement from being formed, in which case the agreement is not merely voidable, as in the case of fraud, but is absolutely void, both at law and in equity. In the case at bar, however, there was no mistake as to the party contracted with, and no mistake as to any of the terms of the contract. The contract made was in all respects the identical contract each of the parties intended it to be. It is conceded, however, that every agreement must have a subject-matter to operate upon. There is a general rule that, if the parties agree in regard to a thing which unknown to them does not exist at the time, there is no contract, for there is no subject-matter. If parties agree to sell a picture or a building, and at the time of the sale the picture or the building is not in existence, that fact being unknown at the time to the parties to the agreement, there is no contract. And so in the law of fire insurance, if at the time the risk attaches the property insured is not in existence, the parties being ignorant of the fact at the time, the rule is that there is no valid insurance. But that principle had no application to a case where the policy issued was antedated to a period prior to the fire. In that case the fact that the property insured was not in existence does not invalidate the policy. Thus in Hallock v. Commercial Ins. Co., 26 N. J. Law, 268 (1857), the facts were as follows: The policy was signed at Jersey City, N. J., on March 13, 1855. It insured property at Bath, N. Y., from March 10, 1855, noon, for a period of one year. It was mailed to the agent of the insurance company at Bath, with instructions to deliver it. The agent did not in fact receive it until March 16th. It

turned out that the property insured had been burned in the early morning of March 13th, which was before the policy had been signed, although the policy was signed later on the same day, so that the property did not exist when the policy was signed, that fact being unknown to the company. When the company discovered the fact it telegraphed its agent at Bath not to deliver the policy, and it was never delivered. The telegram read: "Risk not taken when burnt, return policy when received." The court held the company liable and said:

"They intentionally made the year's risk commence from the 10th. If the fire had occurred on the 13th March, 1856, instead of 1855, under this policy the defendants could not have been held liable. When they filled up the policy, they elected to take the premium from the 10th. They took their pay for the very time during which the fire occurred, and thus say now, in effect, this is a very good policy from the 10th to the 13th, if no fire occurs, but a void one if there does. The question, therefore, really is: Is a contract to insure against fire from a time past void in law? No decision or authority or principle sustaining such a doctrine has been referred to before us. It is every day's practice in both marine and fire insurance. A contract is good, unless shown to be against good morals or sound policy. I do not see how this contract contravenes either, or what difference in principle there can be between insuring from a time past and a time to come. Many cases will be found recognizing the validity of such contracts. Lightbody v. N. American Ins. Co., 23 Wend. (N. Y.) 18; Perkins v. Washington Ins. Co., 4 Cow. (N. Y.) 645; Kohne v. Ins. Co. of N. America, Fed. Cas. No. 7,920; General Interest Ins. Co. v. Ruggles, 12 Wheat. 408, 6 L. Ed. 674; New York Cent. Ins. Co. v. Nat. Protection Ins. Co., 20 Barb. (N. Y.) 475."

In the case at bar the policy took effect by relation from the day of its date. Lightbody v. N. Am. Ins. Co., 23 Wend. (N. Y.) 18 (1840). By antedating the policy the defendant assumed the retrospective risk for which it provided, in the same manner as if it had been issued on the day it bore date. Hughes v. Mercantile Mutual Ins. Co., 44 How. Prac. (N. Y.) 351, 355. It is therefore wholly immaterial in the case at bar that at the time the policy issued or the risk attached the property insured was not in existence; it having been in existence within the period covered by the terms of the policy.

The changes in the policy suggested by the agent of the insured in the telegram sent on April 29th were forwarded without the knowledge of the insured, and were to correct the agent's own mistake of the previous day and make the policy conform to the original instructions given to the agent by the insured. As the agent had no knowledge of the loss, he was under no obligation to impart what he did not possess; and as the insured understood that the insurance had been secured according to his instructions and did not know of this telegram of April 29th he was not at fault; and as the loss occurred within the period covered by the policy, neither the insured nor its agent being in any way at fault, the company cannot escape the liability it assumed when it antedated its policy, unless there is some other ground than the fact that the contract as expressed in the policy was not in all of its terms agreed upon until after the fire.

[7] A contract of insurance is ordinarily complete and closed when the binder is signed and delivered. Van Tassel v. Greenwich Ins. Co., 151 N. Y. 130, 45 N. E. 365. In the remarkable case cited, in which there were six trials and ten hearings on appeal, the binder was sus-

tained as equivalent to a standard one-year policy and subject to the standard five-day cancellation clause, though the binder specified no rate, and though no policy was ever delivered or premium paid. And see Smith & Co. v. Prussian Nat. Ins. Co., 68 N. J. Law, 674, 54 Atl. 458; British American Ins. Co. v. Wilson, 77 Conn. 559, 60 Atl. 293. In Richards on Insurance (3d Ed., 1910) it is said:

"The regular binder is the same thing in effect as the usual policy, for which it stands as a convenient, temporary substitute, and, whether it so states or not, embraces by inference all the clauses of the policy."

If the defendant had never issued a policy, and the proposition of the Duluth Log Company had been correctly transmitted by its agent to the defendant's agent, and accepted by it by the delivery of the "binder," there could be no question but that defendant would have been bound. But the fact seems to have escaped the attention of counsel on both sides that on April 28th the minds of the insured and the insurer had not met. That they had not met is shown by the testimony of the agent of the insured, and already mentioned, that in sending on the first "forms" he had not conformed to his instructions, and that on April 29th he sent forward the second "forms" in order to rectify his previous mistake. If this is the fact, we do not see that any contract existed on April 28th. But that fact is immaterial in view of the subsequent issue of the policy, which merged all prior negotiations and was antedated to make the risk attach on April 28th; both the insured and its agent being blameless in respect thereto.

[8, 9] This brings us to inquire whether any fraud was practiced upon the adjuster, or upon the defendant, in misrepresenting the value of the property. The defendant claims that such fraud was practiced. The burden was on the defendant to prove the fact by a fair preponderance of the evidence. The question was one of fact for the jury. It was fairly presented to them, and they have decided it, as their verdict shows, adversely to the defendant. Their verdict is not to be disturbed, unless clearly against the weight of evidence, which assuredly it is not.

[10] The denial of defendant's motion to amend its answer so as to plead fraud in the execution of the policy presents no question which we can review. The matter was discretionary with the trial judge.

Courts must take due care to see that parties are not held to contracts they do not make. But they must also exercise due care to see that contracts which the parties do make are performed in good faith according to their terms. It is particularly important that insurance companies, which issue policies of insurance to applicants blameless throughout the negotiations, should not be permitted to avoid those policies, or the contracts into which they entered, unless good and valid reasons are shown which justify invalidating the contracts. In the case at bar we are unable to find that a meritorious defense to the action exists.

Judgment affirmed.

LACOMBE, Circuit Judge (dissenting). I am unable to concur with the majority of the court. This action is not brought on the policy of

insurance issued on May 10th. Originally the complaint averred that a policy was issued and delivered to the insured on April 28th, and that the property covered thereby was destroyed by fire on April 29th. Upon the filing of answer to this original complaint plaintiff filed an amended complaint, in which he averred that on or about April 28th insured made application to underwriter for insurance, and that on said day the underwriter promised and agreed to insure its property, and that defendant would execute and deliver policy in the usual form; also that on May 10th it did issue the policy. The answer to this amended complaint admitted that a contract of insurance was entered into on April 28th. It averred that among the terms and conditions were these: (1) Maximum liability not to exceed $15,000. (2) Underwriters liability for loss resulting from any one fire not to exceed 30 per cent. of such maximum liability. (This was a floater policy, covering lumber in different localities.) (3) That insurance should be subject to 80 per cent. coinsurance clause. The answer further admits the issuance on May 10th of the policy attached to complaint.

It is manifest that the main issue which the parties came into court to try was this: "What contract was entered into on April 28th?" Upon that question proof was introduced, written proof, which stands upon the record wholly uncontradicted. To my mind that proof establishes conclusively what were the terms of the contract. On April 21st the Duluth Company asks for a floater policy on timber products in Minnesota, covering $50,000 at a rate "not to exceed two fifty net." The next day the insurance company replies by telegram and mail asking that forms be forwarded, stating that it could not advise definitely as to acceptance of the proposition until it had a copy of the form; also that it would require a coinsurance clause equal to 90 per cent. and a limit of loss by any one fire—a plain statement that the whole amount of the floater insurance was not to be absorbed by fire at a single place. By telegram and letter of April 22d and 23d the Duluth Company replied, stating that it was willing to pay gross rate of 3 per cent. premium; also that it would agree to an 80 per cent. clause, instead of the 90 per cent. suggested; also that it would agree to limit loss by any one fire to 30 per cent. of the face of the policy. All these negotiations, of course, included the making of a policy in the standard form, with the usual provisions as to care of property, date of notification, proofs of loss, etc.

Such, then, was the proposition before the insurance company; its terms specifically covering the matter in controversy here, viz., the limitation of loss by a single fire. The total amount asked for was $50,000. This proposition the insurance company accepted, with the single modification of the total amount to $15,000. That this acceptance made a binding contract is conceded. If no binding contract was made before the fire occurred, plaintiff under the pleadings would have no case at all. Of course, it was in the power of the parties, who had made this binding contract in express terms, subsequently by agreement to modify any one of those terms. But no such modification was made, or even attempted to be made, until after the occurrence of the fire while the contract was in force, which crystallized the rights and

obligations of both parties. The telegram of May 1st, two days after the fire, would not change it.

It does not seem to me that the well-settled rule that prior negotiations are merged in a subsequent written contract applies here, where it is asserted and must be shown as a condition of plaintiff's recovery that there was a complete contract on April 28th, and where the event which the contract provided for occurred the next day. The agent of the insurance company, who had power to make the contract and agree to its terms, had also power to modify or alter those terms at any time before the fire had created mutual rights and obligations; his agency would not, without proof of special authority, give him the power to give up rights of his principal which had become fixed and determined.

Nor do I think that there is any force in the proposition that the telegram of May 1st sent by the insured and the testimony of its agent as to correcting a mistake in the forms sent changes the situation. To the defendant's contention that the policy should be made to conform to the agreement, it is objected that this could be done only in a direct proceeding to reform the policy. The same objection may with equal force be urged against an attempt by plaintiff to reform the contract on the ground of mistake.